IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA | Hon. Lois H. Goodman |
| v. | Mag. No. 19-4505 |
| ISABEL OTANEZ-SANCHEZ, a/k/a, "Pancho," and JESUS ZAVALA TORRES | **CRIMINAL COMPLAINT** |

I, Kristin Savoy, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**SEE ATTACHMENT A**

I further state that I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations, and that this Complaint is based on the following facts:

**SEE ATTACHMENT B**

continued on the attached pages and made a part hereof.

_____
Kristin Savoy, Special Agent
Department of Homeland Security
Homeland Security Investigations

Sworn to before me and subscribed in my presence,

February 13, 2019             at    Trenton, New Jersey
Date                                         City and State

Honorable Lois H. Goodman
United States Magistrate Judge                    _____
Name and Title of Judicial Officer                Signature of Judicial Office

Case 3:19-mj-04505-LHG   Document 1   Filed 02/13/19   Page 2 of 6 PageID: 2

## ATTACHMENT A

### COUNT 1
**Conspiracy to Distribute a Controlled Substance**

From on or about September 23, 2018 to on or about February 12, 2019, in Atlantic County, in the District of New Jersey, and elsewhere, the defendants,

ISABEL OTANEZ-SANCHEZ, a/k/a/ "Pancho",
and
JESUS ZAVALA TORRES

did knowingly and intentionally conspire to distribute and possess with intent to distribute 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1) & (b)(1)(A), and a quantity of a detectable amount of fentanyl, a Schedule II controlled substance, contrary to Title 21, United States Code, Section 841(a)(1) & (b)(1)(C).

In violation of Title 21, United States Code, Section 846.

## ATTACHMENT B

     I, Kristin Savoy, am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI"). I have knowledge of the facts set forth below as a result of my participation in this investigation as well as from my review of reports from, and discussions with, other law enforcement personnel. Where statements of others are related herein, they are related in substance and in part. Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.

     1.    In or around September 2018, law enforcement received information from a reliable source that an individual referred to as "Pancho", later identified as ISABEL OTANEZ SANCHEZ ("SANCHEZ"), was known to facilitate the transport of large amounts of narcotics from California to New Jersey. Based on this information, HSI commenced an investigation of SANCHEZ and, in furtherance of that investigation, made arrangements for a confidential informant ("CI") to make contact with SANCHEZ.

     2.    Beginning in or around September 2018 and continuing through on or about February 12, 2019, the CI communicated with SANCHEZ through recorded phone conversations and texts messages about purchasing large quantities of narcotics from SANCHEZ in California to be shipped to the CI in New Jersey.

     3.    On or about October 1, 2018, SANCHEZ sent a sample of his narcotics to the CI, via U.S. postal service, to a post office box in Maple Shade, New Jersey. Law enforcement agents seized the package that SANCHEZ mailed to the CI. A field test of a sample of the substance inside the package tested positive for the presence of heroin. The amount of heroin law enforcement seized from the package was approximately fourteen (14) grams.

     4.    After the CI received the sample of heroin, he contacted SANCHEZ about securing a large shipment of narcotics from California to New Jersey. SANCHEZ indicated that he required a face to face meeting with the CI in California before he would sell large quantities of narcotics to the CI.

     5.    On December 11, 2018, the CI met with SANCHEZ at a restaurant in Hemet, California. This meeting was captured by video and audio recordings from the CI's cell phone. Additionally, law enforcement officers, conducting a covert surveillance, observed the meeting between SANCHEZ and the CI. Law enforcement officers observed SANCHEZ arrive to the restaurant driving a black Acura, bearing a California tag ending in 460, and then meet with the CI. Law enforcement officers then observed SANCHEZ leave the meeting in the

same black Acura, which they followed to a nearby residence. A vehicle record check for the black Acura revealed that the car was registered to a female at a San Jacinto, California, address (the "San Jacinto Residence").

6. Following this meeting, SANCHEZ and the CI again exchanged several phone calls and text messages in which SANCHEZ agreed to send methamphetamine from California to the CI in New Jersey. SANCHEZ informed the CI that he would send the narcotics from California to New Jersey hidden inside a vehicle that would be delivered to the CI by a third-party car carrier.

7. In or around December 2018, SANCHEZ sent a letter to the CI confirming that SANCHEZ was sending approximately thirty (30) pounds of methamphetamine to the CI in New Jersey for approximately $156,000.

8. On or about January 28, 2019, a third-party car carrier delivered an inoperable 2012 gray Hyundai Sentra to the CI at an address in Atlantic City, New Jersey, which the CI had provided. Upon receipt of the vehicle, the CI contacted SANCHEZ who informed the CI that the methamphetamine was located in the vehicle's gas tank and that it could be accessed through the rear passenger seat. SANCHEZ also told the CI that he left a sample of something for the CI in the vehicle's air compartment.

9. Law enforcement agents searched the vehicle and recovered from the gas tank approximately twenty-eight cylinder packages tightly wrapped in cellophane, each weighing between 489 to 499 grams. Law enforcement field-tested a sample of the substance inside one of the packages and it tested positive for the presence of methamphetamine. The amount of methamphetamine law enforcement seized from the vehicle was approximately 30 pounds.

10. Law enforcement agents also recovered from the vehicle's air compartment a black balloon containing two individually packaged substances. Law enforcement field-tested a sample of one of the substances and it tested positive for the presence of heroin. The other substance was believed to be fentanyl and was sent to a chemical lab for analysis. The amount of heroin law enforcement seized from the vehicle was approximately twelve (12) grams and the amount of suspected fentanyl law enforcement seized from the vehicle was approximately sixteen (16) grams.

11. After recovering the narcotics from the vehicle, the CI contacted SANCHEZ to discuss details of the CI's delivery of payment for the methamphetamine. The CI also discussed with SANCHEZ purchasing the same fentanyl as the sample SANCHEZ sent when the CI delivered payment for

the methamphetamine. The CI and SANCHEZ agreed to meet in person in California on February 12, 2019, at which point the CI would pay SANCHEZ approximately $156,000 for the methamphetamine the CI had already received and SANCHEZ would also facilitate the sale of fentanyl to the CI.

12. On February 12, 2019, the CI met with SANCHEZ at a restaurant in Hemet, California. This meeting was captured by video and audio recordings from the CI's cellphone and was also observed by law enforcement agents conducting covert surveillance.

13. During this meeting, SANCHEZ called another individual, JESUS ZAVALA TORRES ("TORRES"), to join them. SANCHEZ indicated to the CI that TORRES was the individual who put the methamphetamine into the car that was shipped to the CI in New Jersey and that he would also ship the fentanyl to the CI in New Jersey. When TORRES arrived at the meeting, the CI asked him how much fentanyl he had available to sell to the CI. TORRES replied that he had five (5) kilos. The CI indicated that the CI wished to see some of the fentanyl so the CI could mark the packages before TORRES and SANCHEZ shipped it to New Jersey. Therefore, when the CI received the shipment of fentanyl in New Jersey, the CI would know it had come from the sample the CI had already received and knew to be of good quality. TORRES agreed to go retrieve two (2) kilos of fentanyl and return to the restaurant to allow the CI to see the fentanyl and mark it before it was shipped to him in New Jersey.

14. TORRES left the restaurant, entered a blue Ford F-150 truck, bearing a California license plate ending in 987, and drove away.

15. Law enforcement officers followed TORRES to the San Jacinto Residence. When he arrived at this location, TORRES went inside the home and came back outside carrying a shoebox. TORRES then got back into his blue Ford F-150 and placed the shoebox inside the cab of the truck with him.

16. Law enforcement officers, in coordination with the agents conducting the present investigation, performed a routine traffic stop of TORRES's vehicle on suspicion of drug possession, as well as several traffic infractions. After the stop, TORRES provided consent to search his vehicle and a canine unit was brought to the scene. After TORRES exited the vehicle, he indicated to officers during a routine safety pat-down search that he had narcotics in his pocket. Recovered from his pant pocket was a clear packet containing a brown substance. Thereafter, a trained narcotics detection canine examined the shoebox inside of the cab of the truck on the floor directly behind the driver's seat and alerted to the presence of narcotics. Inside the shoebox were two packets containing a large quantity of a brown substance believed to be fentanyl.

17. Thereafter, law enforcement officers executed a search warrant at the San Jacinto Residence. During the search, law enforcement officers discovered and seized three (3) additional packets containing a large quantity of a brown substance believed to be fentanyl. The suspected fentanyl was recovered from the room the San Jacinto Residence in which TORRES resided